[No. 16457.   *En Banc.*   January 21, 1922.]

SUNSET SHINGLE COMPANY, *Appellant*, v. NORTHWEST ELECTRIC & WATER WORKS, *Respondent*.[1]

ELECTRICITY (1, 3)—STATUTORY CONTROL—CONTRACTS FOR POWER AND LIGHT—VALIDITY—DISCRIMINATIONS. A contract by a public service corporation to furnish power for driving mill machinery, electric light for the mill plant, steam heat for its dry kilns, and make repairs to its machinery, in consideration for the transfer by the mill company of its steam plant which was to be used for generating electricity, does not constitute a public service contract, the contract being one for private service, before the dedication of any service to the public.

CONTRACTS (4)—MUTUALITY OF OBLIGATIONS. A contract whereby a mill company transfers its steam plant to an electric company, for which it is to supply fuel in return for electric power and light, cannot be said to be void for want of mutuality because of the possibility of the mill company's ceasing to operate its plant at pleasure, where the contract also provides that, in case of a "shut down" of the mill, the electric company shall have the use of its saws and conveyors for the purpose of supplying necessary fuel.

ELECTRICITY (1, 3)—STATUTORY CONTROL—CONTRACTS FOR POWER—VALIDITY. In a contract calling for the furnishing of fuel to operate a steam plant for the generation of electricity in exchange for electric light and power so generated, a provision that the parties shall render monthly bills to one another for such services, charging an equal amount therefor, is not an admission by the parties that the furnishing of the electricity is a public service, but shows rather the intent of the parties that the contract should not fall within the regulatory provisions of the public service statutes.

[1]Reported in 203 Pac. 978.

DAMAGES (72, 74) — BREACH OF CONTRACT — MEASURE — EXPENSE INCURRED—LOSS OF PROFITS. Under a contract to furnish electricity and steam for a term of thirty-five years, which was breached a few years after it was entered into, the proper measure of damages is the expense of replacing the lost service, the injured party not being entitled to recover damages on the basis of yearly loss of profits for the balance of the term.

SAME (72). A valuation fixed by the parties on a steam plant in a transfer by a mill company to an electric company in consideration for a service of electric light and power for which the plant was to be utilized, is not the proper measure of damages on a breach of the contract by the electric company, but the mill company would be entitled to recover for loss of time and expense in changing back to a steam plant and replacing the electrical machinery which had depreciated in value.

Appeal from a judgment of the superior court for Grays Harbor county, Sheeks, J., entered November 22, 1920, upon findings in favor of the defendant, dismissing an action for damages for breach of contract, tried to the court. Reversed.

*W. H. Abel* and *Chadwick, McMicken, Ramsey & Rupp,* for appellant.

*Burkheimer & Burkheimer,* for respondent.

PARKER, C. J.—The plaintiff, Sunset Shingle Company, commenced this action in the superior court for Grays Harbor county, seeking recovery of damages from the defendant Northwest Electric & Water Works, claimed as the result of a breach of a contract by the defendant. The contract in question was entered into between them on February 3, 1915, looking to the electrification by the defendant of the plaintiff's manufacturing plant, the construction of a steam electric plant by the defendant on ground to be conveyed to it by the plaintiff, from which the defendant was to furnish to the plaintiff electric power to operate the machinery of its plant, and also steam heat to

operate the dry kilns of its plant. The damages claimed by the plaintiff were for its loss from the diminished output of its plant during the years 1918 and 1919 because of the defendant's failure to furnish power in quantity as agreed; for its loss for the failure of the defendant to furnish steam heat in quantity as agreed to efficiently operate its dry kilns, in that the shipping weights of its products were not reduced to normal weights, resulting in the necessity of paying excessive freight rates in the marketing of its products; expenses it was compelled to incur for repairs to certain of its machinery, which under the contract it was the duty of the defendant to make; and depreciation of the value of its mill plant because of the change of its power from steam to electricity as the result of the contract.

The defendant by its answer denied that it had failed in any respect to do all that it was required to do by the terms of the contract, and denied that the plaintiff suffered any damages as the result of any such failure. These denials were followed by affirmative defenses set up by the defendant, which are in substance that it is a public service corporation "furnishing electricity for light, heat and power for hire to the city of Montesano and its inhabitants"; that the service agreed to be rendered to the plaintiff is a public service; that the contract therefore is void because the agreed charge therefor constitutes an undue and unreasonable preference as against the public service customers of the defendant in violation of the regulatory provisions of our public service statutes. The cause was tried before the court sitting without a jury, and resulted in findings, conclusions and judgment made and rendered in favor of the defendant, denying to the plaintiff recovery in any amount; the trial judge concluding as matters of law that the con-

tract "was made in violation of the statutes of the state of Washington" and "is void and of no effect." Following the findings and conclusions upon which the judgment was rested, the trial judge further found:

"(1)   That the plaintiff performed the contract on its part.   To which defendant excepts and exception allowed. . . .

"(2)   That the defendant breached the said contract upon its part and because of the defendant's said breach the plaintiff suffered loss and damage in the sum of $67,764.32.   To which defendant excepts and exception allowed."

These findings were evidently made to the end that they might become the basis of a judgment to be rendered in favor of the plaintiff in the event of this court holding upon appeal that the contract, the breach of which is claimed as a basis of recovery by the plaintiff, is a valid and binding contract upon the defendant. The plaintiff, seeking reversal of the judgment, and the rendering of a judgment awarding to it damages in accordance with the findings of the trial court, above quoted, has appealed to this court.

There seems to us to be no room for serious controversy as to what we deem to be the controlling facts of the case, in so far as the validity of the contract in question is concerned.   The involved nature of this problem, however, renders it necessary that we make a somewhat extended and comprehensive statement of facts.   Appellant has been a corporation of this state ever since long prior to entering into the contract in question, and from about the year 1907 up until the time of the commencement of this action in November, 1919, has owned and operated a large shingle manufacturing plant, manufacturing shingles therein and marketing them therefrom upon a somewhat extensive scale.   Its plant has at all times been located near the

city of Montesano, in Grays Harbor county. Up to a short time following the entering into of the contract, the power and heat necessary to operate appellant's mill machinery and dry kilns were supplied by its own auxiliary steam plant constituting a part of its general plant.

Respondent has been a corporation of this state ever since the year 1912. Speaking generally, it may be said to be a public service corporation, in that its articles of incorporation indicate that to be its principal business, and in that its principal business since some years prior to entering into the contract here in question seems to have been the furnishing of electric light to the city of Montesano and its inhabitants in pursuance of a franchise granted by that city. It seems that respondent may have then furnished power, other than for light, to industrial and other plants in the city, though the record does not show to what extent such power had been so furnished. The record is silent as to respondent ever furnishing power to any person or corporation outside the city, other than to appellant and two other concerns; one being a machine shop, and the other being a certain gravel plant. The record does not inform us just how or where respondent acquired its electric energy which it furnished to the city and its inhabitants up to the time of entering into the contract; though up to that time and since then respondent seems to have been possessed of a generating electric plant some miles distant from the city.

About January, 1915, respondent's representative approached appellant's representative with a view of entering into negotiations looking to the electrification of appellant's plant and the construction by respondent, upon ground to be furnished by appellant, of a

steam generating electric plant; to the end that such steam electric plant, to be operated by respondent, should be furnished with fuel from appellant's mill, and electric power be furnished from such steam electric plant for the running of appellant's mill and steam heat to operate its dry kilns; it being contemplated that respondent would thereby be enabled to produce electric power from such plant in excess of that which would be necessary to operate appellant's mill and dry kilns, to the end that such additional power might be disposed of by respondent at a profit.

The foregoing, we think, is a fair statement in substance of the respective conditions we find these parties in when they entered into the contract on February 3, 1915. To the end that we have clearly before us the controlling purpose of that contract and just what each of the parties agreed to do, we quote therefrom, so far as we deem necessary for our present inquiry, as follows:

"This contract by and between Sunset Shingle Company, of Montesano, Washington, the first party, and Northwest Electric & Water Works, of the same place, the second party, Witnesseth:

"The general object of this contract is to provide for the electrification of the first party's shingle mill in Montesano, and operation by electricity generated and furnished by the second party, and the construction and operation of a steam electric plant at Montesano by the second party on land to be acquired by it from the first party near the said shingle mill; and all the details hereof are to be construed in the light of that general object.

"The first party, in consideration of the undertakings of the second party herein, agrees that it will, as hereinafter provided, sell, convey and transfer to the second party the following: [Here follows specification in detail of the property, consisting of one-half

acre of land near appellant's plant, and the machinery and equipment of appellant's steam plant.]

"All of the foregoing land and chattels are estimated by the parties at the value of Thirty-five Hundred Dollars. . . .

"In consideration of the foregoing, the second party agrees that:

"The second party will, with all convenient speed, construct upon said parcel of land a modern steel electric power house and plant of a total capacity of six hundred (600) horsepower, which plant shall consist of: [Here follow specifications.]

"The second party will also simultaneously with the construction of the said plant, or immediately after the same is finished, deliver and transfer to the first party, and install in its mill, the following electrical apparatus for operating its mill: [Here follows specification of electrical apparatus so to be furnished and installed.]

"The second party will furnish from its electric plant to said mill all electric current needed for operation of said mill, including lights, and whether said mill shall be operated eight hours, or more, per day not to exceed nineteen (19) hours per day, that is, omitting the five hours from six P. M. to eleven P. M., unless the parties shall otherwise agree. The second party agrees that it shall furnish such current of sufficient voltage and frequency to operate the first party's mill efficiently and without dragging, provided that the first party's machinery is kept in good operative condition. The second party will also from time to time inspect and keep in good order at its expense, the electrical equipment in the first party's mill, but the first party is, at its expense, to furnish lamps in its mill.

"All mill waste produced from the first party's mill whatever shall be delivered over said conveyors to the second party for its use, and the second party shall store such thereof as it shall not immediately use, and accumulate a surplus for use during any time of shut down of the mill.

"The second party shall charge the first party for the current furnished to it according to its filed and

published tariff of rates, as the same now is, or at any future rate as the same may be approved by the Public Service Commission, or other authority of the state; and shall also make a charge for the steam furnished to the dry kiln according to a steam tariff to be filed and published by it. Such charge shall include steam and current for lighting furnished at night or other hours of the day when the mill is not running, but is not 'shut down' in the usual sense. Monthly bills for such service of current and steam shall be rendered in the usual way. The first party shall also charge and render monthly bills to the second party for all the fuel furnished to the second party as aforesaid, and shall charge therefor the same amount as shall be charged for the same period of time by the second party for its current and steam. At any time that the mill shall be 'shut down', and not in operation any hour of the day, and the first party shall desire the second party to supply it with steam or with current for lighting, the second party shall render a monthly bill for such current to be metered and charged for at the regular tariff rate, and shall also render a bill for steam charged at its steam tariff rate. But in the event of a 'shut down' as aforesaid, the first party shall receive credit from the second party as paid by fuel already furnished for the first week of any such 'shut down', and shall pay the monthly bill less said week's credit.

"In the event that the mill shall be 'shut down', and the second party shall exhaust its store of mill waste fuel, and desires to continue to use wood fuel instead of oil fuel, it shall have the use of the saws in the first party's mill without charge, but at its expense for material, current and labor, in order to produce wood fuel for use in its furnaces. The second party shall provide sufficient storage capacity for all surplus fuel produced by the mill, and not immediately used, and shall store the same and use it as needed; but if the mill in its operation does not produce enough fuel either at its present or any enlarged capacity, to operate the second party's plant to its full initial capacity, then the first party shall pay the second

party at the rate of One Hundred Dollars ($100) per month for such time as the second party is compelled by the shortage of such fuel to produce additional fuel, either wood or oil, at its own expense, provided that in event of shut down of said mill this provision shall not apply for longer than one week's time in each shut down.            •

"All the provisions of this contract shall apply in behalf of the first party to any enlargements of its present plant up to the capacity of double the present plant; but it shall be optional with the second party whether it will enlarge its plant sufficiently to provide current for any larger capacity of the first party's mill than double its present capacity.

"This contract shall remain binding upon the parties, and upon their respective assigns and successors owning or operating said respective mill and electric plant, during the continuance of the present electrical franchise of the second party, that is, until August 31, 1950, inclusive.

"All of the foregoing electrical equipment to be furnished and installed by the second party at its expense in the first party's mill, is agreed by the parties as having a total value of Thirty-five Hundred Dollars, not including the wiring of the mill for lighting, which is to be at the first party's expense.

"It is also agreed by the second party that it will at its expense connect with the second party's plant, and with the first party's water mains, the large pump above mentioned, which is now in use at the first party's mill for fire protection, and will at all times keep said pump in operative condition ready for instant use by the first party in case of fire at the first party's mill. . . ."

Appellant has timely done all things agreed by the terms of the contract by it to be done. Respondent in due time constructed its steam electric plant, and we assume for present purposes has timely done all things agreed by it by the terms of the contract to be done; except the furnishing of sufficient electric power to

properly drive the machinery of appellant's plant during the years 1918 and 1919, the furnishing of sufficient steam heat to properly operate appellant's dry kilns during the years 1915 to 1919, inclusive, and the keeping in repair during the years 1918 and 1919 of the electric motors and pumps in appellant's plant. It was the failure on the part of respondent to fully perform the contract in these particulars that constitutes the basis of the trial judge's findings that, because of such failure on the part of respondent, appellant has suffered loss and damage in the sum of $67,764.32, though concluding, as a matter of law, that appellant could not recover such damage because of the invalidity of the contract.

The evidence, we think, clearly shows that all of the power, light and heat service rendered by respondent to appellant was from respondent's steam electric plant, constructed in pursuance of the terms of the contract; that the contract contemplated that all power, light and heat service to be rendered by respondent to appellant should come solely from that steam electric plant; that that steam electric plant was well capable of furnishing all the electric energy and steam heat required by the terms of the contract to be furnished; and that the failure of respondent to furnish electric energy and steam heat in the full measure required by the terms of the contract was caused by the respondent diverting power generated by that plant, in violation of the terms of the contract, to the supplying of its customers in the city of Montesano.

The theory upon which respondent's affirmative defenses and the trial court's judgment are rested is, in substance, that the contract is void and of no binding effect upon respondent because respondent is a public service corporation, because the contract is for the

rendering of a public service by respondent, and because the contract provides for such compensation for the service as in effect constitutes an unlawful discrimination in favor of appellant as against respondent's public service customers, in violation of the provisions of our public service statutes.

We may concede for present purposes that respondent is, generally speaking, a public service corporation; that is, that its principal business is rendering public service to the city of Montesano and the inhabitants thereof in furnishing electric energy for light, and that as to such service it is subject to the regulatory provisions of our public service statutes as to uniformity of rates charged and quality of service rendered. But it does not follow that every act and thing done by respondent, even though it be in a sense service rendered to a person or corporation in compliance with the terms of some contract made by it with such person or corporation, is a public service subject to the regulatory provisions of our public service statutes. In controversies such as this, the question is not so much as to whether or not the corporation is a public service corporation—a general term often of very loose application when discussing public service problems—but whether or not the service in question is a public service. Manifestly our public service statutes and the administration of them have to do only with public service rendered by corporations engaged therein. Therefore let us not be led astray by the fact that respondent is, generally speaking, a public service corporation; but direct our inquiry to the question of whether or not the service here in question, agreed to be rendered to appellant by respondent, is a public service. If it is not, then plainly the contract in question does not fail of its

binding force upon respondent because of the provisions of our public service statutes.

Now, looking alone to those things here in question which by the terms of the contract respondent was to do, which could be characterized as service to be rendered by it to appellant, we find that respondent agreed to furnish: electric power for driving appellant's mill machinery; electric light for appellant's plant; steam heat for operating appellant's dry kilns; and repairs to appellant's machinery. We think it needs no argument to demonstrate that neither the agreeing to furnish steam heat for the dry kilns, nor the agreeing to make repairs to appellant's machinery, was the agreeing to render a public service to appellant. It seems to us equally plain, under our decisions and under the circumstances here shown, that the agreeing to the furnishing of electric power for the driving of the machinery of appellant's mill was not the agreeing to render public service to appellant. It has been repeatedly held by this court that the furnishing of electric or other power for the driving of machinery of industrial or other plants is not the rendering of such a public service as will sustain the exercise of the power of eminent domain looking to the acquisition of property to be put to such use. *State ex rel. Tacoma Industrial Co. v. White River Power Co.,* 39 Wash. 648, 82 Pac. 150, 4 Ann. Cas. 987, 2 L. R. A. (N. S.) 842; *State ex rel. Harris v. Superior Court,* 42 Wash. 660, 85 Pac. 666, 7 Ann. Cas. 748, 5 L. R. A. (N. S.) 672; *State ex rel. Tolt Power etc. Co. v. Superior Court,* 50 Wash. 13, 96 Pac. 519; *State ex rel. Shropshire v. Superior Court,* 51 Wash. 386, 99 Pac. 3; *Tacoma v. Nisqually Power Co.,* 57 Wash. 420, 107 Pac. 199; *State ex rel. Public Service Comm. v. Spokane & I. E. R. Co.,* 89 Wash. 599, 154 Pac. 1110.

Assuming for argument's sake only, that a corporation may so dedicate its property to the furnishing of electric power to the public for purposes other than light, so as to make such furnishing of power a public service subject to the regulatory provisions of our public service statutes; we are still quite convinced that what might be here termed such a dedication of this steam electrical plant was at all events subject to appellant's rights under the terms of the contract. Those rights were acquired and reserved to appellant as against this very steam electric plant as well as against respondent generally, at the time of the coming into existence of the plant. Indeed, this steam electric plant was constructed for and in a sense dedicated to the service of appellant's plant before the public could possibly have acquired any rights therein by virtue of the dedication of that plant by respondent to the furnishing of power to the public as a public service. In other words, the service to be rendered by this steam electric plant which in any sense could be said to be dedicated to the public, was the service which it might be able to render to the public after the service rendered which appellant was entitled to under the terms of the contract, which we think never has been dedicated to the public service and hence remains a private service. The decisions of the California supreme court in *Del Mar Water, Light & Power Co. v. Eshleman*, 167 Cal. 666, 140 Pac. 591, 948, and *Mound Water Co. v. Southern California Edison Co.*, 184 Cal. 602, 194 Pac. 1014, lend strong support to this conclusion.

The facts of this case to our minds render it readily distinguishable from our decisions in *Cowley v. Northern Pac. R. Co.*, 68 Wash. 558, 123 Pac. 998, 41 L. R. A. (N. S.) 559; and *Raymond Lumber Co. v. Raymond*

*Light & Water Co.,* 92 Wash. 330, 159 Pac. 133, L. R. A. 1917C 574. The *Cowley* case involved a pure public service contract in its inception; that is, the carrying of passengers by a common carrier. The *Raymond Lumber Co.* case also involved a pure public service contract in its inception; that is, the furnishing of water by a public service water company from its property and sources already dedicated by it to public service.

The furnishing of light to appellant's plant presents a problem which may be said to be somewhat differently conditioned from the furnishing of power and steam, in that light service might support the exercise of the power of eminent domain; but there still remains the fact that this light service was to and did come from a source not dedicated to public service. However, there is no claim here made by appellant that there was any failure on the part of respondent to furnish light. Indeed we are not advised by this record as to how the execution of that portion of the contract was considered by the parties as being influenced by the regulatory provisions of our public service statutes.

Some contention is here made that the contract in question is void for want of mutuality of obligation. This contention seems to be rested upon the possibility that appellant might at its pleasure close and cease the operation of its plant, and thus not furnish to respondent any fuel for the operation of its steam electric plant. But a casual reading of the contract will disclose that there would still remain the obligation on the part of appellant to furnish to respondent the use of its saws and conveyors for the cutting and conveying of fuel to respondent's steam electric plant; and besides we find in the contract that appellant's conveyors were extended and changed at its own expense for the express benefit of respondent in the conveying to its plant

of fuel therefor. Our decisions in *Sultan R. & Timber Co. v. Great Northern R. Co.,* 58 Wash. 604, 109 Pac. 320, 1020; and in *Parks v. Elmore,* 59 Wash. 584, 110 Pac. 381, seem to us decisive of this contention in appellant's favor.

No contention is made that the contract in question is void as being *ultra vires* in the light of respondent's powers enumerated in its articles of incorporation. We note, however, that those enumerated powers do seem to strongly suggest that respondent was organized for the sole ultimate purpose of rendering public service. This contract, however, was manifestly entered into by respondent with a view of promoting and extending its public service; but that does not argue that its contractual obligations to appellant under this contract are public service obligations. Those obligations to our mind were no more public service obligations on the part of respondent, in the light of the circumstances in this case, than would be its obligation to pay for some piece of machinery or appliance which it might purchase looking to the increasing and betterment of its facilities to perform its public service obligations.

We have not lost sight of the provisions of the contract valuing the steam machinery and appliances constituting appellant's plant which were transferred by it to respondent, and the electrical machinery and equipment furnished and installed in appellant's plant by respondent, each at the sum of $3,500. Just what the purpose of this fixing of values by the terms of the contract was, we confess is not made very certain, though it does suggest that such valuations show that appellant's plant remained of the same value as before the change, viewed apart from the service to be rendered by each to the other. Nor have we lost sight of the statement made in the contract that monthly bills shall be rendered by respondent to appellant for power

and heat at current rates, and that appellant shall render to respondent monthly bills for fuel furnished, charging an equal amount therefor.   This latter provision may have been prompted by the parties foreseeing a possibility that the contract would fall under the ban of the regulatory provisions of the public service statutes; but we do not construe them as an admission by either party that the contract does fall under such ban.   Reading the contract as a whole, and observing the manner of commingling the several obligations of each party to the other, we are unable to see that any one or more of the things to be furnished or done by each party was intended as a separate consideration for any one or more of the things to be furnished or done by the other party; but are of the opinion that all that was to be furnished and done by one party, in law became a single consideration for all that was to be furnished and done by the other party.   So viewing the contract, we conclude that it became binding and enforceable as against respondent, and that a breach of its terms by respondent rendered respondent liable in damages to appellant to whatever extent such breach may have caused such damage.

A reading of the evidence has convinced us that the trial court correctly found that appellant performed the contract on its part; and that respondent breached the contract, resulting in damage to appellant; though we can not agree with the trial court as to the proper measure or amount of such damage.   It is contended by counsel for respondent that there can not be applied to appellant's damages any lawful rule of measurement, because of their inherent nature and uncertainty, especially insofar as such damages are rested upon claimed loss of profits.   While the trial court found that appellant was damaged in the sum of $67,764.32 by reason of respondent's breach of the contract, the finding does

not show what items of damage the court had in mind
in making up this total. That, however, is readily as-
certained from the record before us. The items of
damage claimed by appellant in its bill of particulars,
which in effect became an amendment to its complaint,
are as follows:

| | |
|---|---:|
| Loss on diminished shingle cut during 1918.............. | $5,717 52 |
| Loss on diminished shingle cut during 1919.............. | 42,893 61 |
| Loss by reason of expense repairs to pumps.............. | 301 00 |
| Loss in under-weights by reason of lack of steam........ | 7,943 50 |
| Loss by reason of expense repairs to motors............. | 848 19 |
| Loss by reason of depreciated value of mill at time of sale | 22,000 00 |
| | $79,703 82 |

In the remarks of the trial judge found in the state-
ment of facts, announcing his finding touching the
amount of damage suffered by appellant, it is made
plain: that the judge awarded the damage claimed by
appellant by reason of the diminished output of its mill
in the years 1918 and 1919 in the amount claimed by
appellant, less fifteen per cent thereof; that the judge
awarded the damage claimed by appellant by reason
of its expense in repairing the motors and pumps in
its plant in the amount claimed by appellant; that the
judge awarded the damage claimed by appellant by
reason of the lack of steam heat to be furnished by re-
spondent in the amount claimed by appellant less
thirty-three per cent thereof; and that the judge
awarded the damage claimed by appellant for depreci-
ation of the value of its mill plant, by reason of the
change from steam to electric power, in the sum of
$20,000; which items aggregate the total of $67,764.32
which the judge found appellant to be damaged by
reason of the breach of the contract by respondent.
Appellant at all times in question had a large, prof-
itable and well-established manufacturing business,
with a ready market for all that its plant was capable

of producing, running at its full capacity, when furnished with adequate power and heat.

The items relating to "diminished shingle cut" and "under-weights," we understand, are concededly claims of damages resting upon the theory of loss of profits. We think the evidence is sufficiently certain touching such loss, as found by the trial judge, insofar as the rule of damage for loss of profits is applicable thereto under the circumstances of this case; but we do not think that rule is applicable to the whole of these items, covering the whole period within which they are claimed to have accrued. If appellant's theory upon which these claims of loss are rested were to be carried to its logical conclusion, appellant could, without effort on its part, looking to the mitigating of such damages, let them run on during the entire term of the contract, which does not end until 1950; and enforce successive recoveries thereon, within periods of the statute of limitations for the bringing of actions, amounting in the aggregate to its entire loss of profits covering that long period; even though the breach of the contract on the part of respondent should be a denial of all obligations thereunder immediately after it was entered into. It seems to us that this cannot be the law controlling the respective rights of these parties upon this branch of the case. Now we think there arrived a time when the breach of the contract by respondent became so flagrant as to, in effect, give notice to appellant that it would no longer be bound by the terms thereof insofar as the furnishing of power, steam and repairs is concerned. When appellant became so advised, we think it was then obliged to proceed, in the further protection of its rights, upon the theory that the contract, in those respects at least, was completely breached; and that thereafter appellant's

damage, if any, suffered because of such breach, was measurable not by loss of profits, but by the expense of putting its plant in such condition, as to machinery and appliances, as would enable it to proceed in its manufacturing business as advantageously as it could have proceeded had respondent not so breached the contract. On the other hand, we think that, prior to appellant's being so advised, and during the period when respondent was serving appellant in a measure, but not fully, as contemplated by the contract, and under such circumstances as to lead appellant to believe that such service would be presently improved so as to fully comply with respondent's obligation under the contract, appellant's loss of profits resulting from want of such proper service under the contract would be a proper measure of damage. It seems plain to us that during such a period appellant was fully warranted in not undertaking to make a change in the equipment of its plant, but was warranted in assuming that the service it was entitled to receive under the contract would be presently forthcoming in full measure from respondent.

It is very difficult, in the light of this record, for us to say with certainty just when the contract was so completely breached by respondent, touching the service in question, as to advise appellant that it could no longer expect proper service from respondent in the future. We think, however, that the evidence warrants the conclusion that, at the close of the year 1918, such a turning point in the relations of appellant and respondent occurred; and therefore conclude that loss of profits resulting from "diminished shingle cut" and "under-weight" accruing before that time constitute a proper measure of appellant's damages as to those items. We adopt approximately the trial court's find-

ing upon the loss by reason of the "diminished shingle output" prior to the close of the year 1918, and so fix appellant's recovery upon that item at $4,800. As to appellant's loss by reason of "under-weights" prior to the close of the year 1918, we conclude that it is entitled to recover $2,500.

As to the loss by reason of expense incurred by appellant in repairing pumps and motors which respondent should have repaired, we adopt the finding of the trial court, and so fix appellant's recovery upon those items at $1,149.

The claimed loss to appellant by reason of the depreciation of the value of its mill plant, flowing from the change from steam to electricity, is somewhat problematical. We have seen that the value of the steam machinery and appliances taken over by respondent from appellant, and the value of the electric machinery and appliances installed in the mill by respondent, are agreed to be the same, to wit, $3,500. Viewed superficially, this may seem to suggest that the mill plant was not thereby depreciated in value in any amount. But when we remember that appellant would necessarily be at considerable·expense and loss of time changing the plant back to a steam plant, necessitating the replacing of the electrical machinery therein, which had become of some considerable age, the conclusion must be that appellant can not put its plant in as good condition as it is entitled to have, as against respondent, except at a considerable expenditure of time and money; that is, the mere balancing of the agreed valuations of $3,500 would not save appellant harmless. Appellant is entitled to recover damages from respondent on this item in the sum of $3,000. This may seem to be an award not certainly proved, but respondent, we think, is not in posi-

tion to complain of such an award; when such damage is necessarily only an approximation as to amount; it being certain as to its substantial character, and flowing from respondent's wrongful breach of the contract.

The judgment is reversed and the cause remanded to the superior court with directions to enter a judgment in the sum of $11,449 in favor of appellant Sunset Shingle Company and against respondent Northwest Electric & Water Works.

FULLERTON, TOLMAN, HOVEY, and HOLCOMB, JJ., concur.