Demurrers sustained.

---

## ST. PAUL & TACOMA LUMBER CO. v. NORTHERN PAC. RY. CO.

(District Court, W. D. Washington, S. D. February 5, 1924.)

### No. 159.

1. **Carriers** ⊙⇒1—Contract by Northern Pacific Company for intrastate rate held not exempted by charter from state regulation.

   Act July 2, 1864, incorporating the Northern Pacific Railroad Company, *held* not to exempt a contract made by the company granting a special intrastate rate from the regulatory police power of the state.

2. **States** ⊙⇒9—Contracts made prior to statehood held not exempted from police power of state.

   Const. Wash. art. 27, § 1, providing that "no existing rights * * * contracts or claims shall be affected" by the change from territorial to state form of government was intended only to preserve the existing status quo of rights and contracts pending enactment of new laws by the state, and does not have the effect of exempting contracts made prior to statehood from the operation of laws enacted by the state under its police powers.

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **States ⬅9—Rate contract by railroad made before admission of state not protected from state legislation.**

That a contract by a railroad company granting special rates to a shipper on local traffic was made before admission of the state does not exempt it from the operation of a law, subsequently enacted by the state, prohibiting discrimination in rates and creating a public service commission with power to regulate rates.

4. **Constitutional law ⬅117—Contracts are subject to subsequent exercise by state of its police powers.**

A contract, though legal and valid when made, if it relates to a subject-matter within the police power of the state, is subject to the subsequent exercise of such power.

5. **Contracts ⬅303(2)—Damages for breach not recoverable, where performance rendered impossible by subsequent legislation.**

Under the law of Washington, established by decision, complainant *held* not entitled to damages for breach of a contract by defendant railroad company to carry logs at a specified rate, where subsequent legislation of the state rendered such contract illegal.

6. **Contracts ⬅10(3)—Contract with railroad company to furnish stated amount of traffic held void for lack of mutuality.**

An agreement by a manufacturer of lumber to ship a certain proportion of its product over the lines of a railroad company implies an agreement by the company to furnish cars for such shipments, whether or not it furnishes cars to other shippers, which, being illegal, as preferential, leaves the contract lacking in mutuality.

7. **Specific performance ⬅55—Not barred because contract contains provision illegal as to defendant only.**

Complainant *held* not barred of the right to specific enforcement of a contract with defendant railroad company because it contained a provision giving complainant an unreasonable preference in rates, which constituted a misdemeanor on the part of defendant, but not on the part of complainant.

In Equity. Suit by the St. Paul & Tacoma Lumber Company against the Northern Pacific Railway Company. Decree for complainant in part.

Grosscup & Morrow, of Seattle, Wash., for complainant.

Geo. T. Reid, C. H. Winders, and L. B. Da Ponte, all of Seattle, Wash., for defendant.

Donworth, Todd & Higgins, of Seattle, Wash., amici curiæ.

CUSHMAN, District Judge. Complainant sues for the specific performance of a contract for an intrastate freight rate of $1 per thousand on logs from certain lands acquired by complainant from the defendant shipped to complainant's mills at Tacoma, and to recover freight charges already paid in excess of that rate. Alternative relief, to be hereinafter considered, is also asked.

Sections 3, 11, and 15 of the act of Congress (13 Stat. 365) incorporating the Northern Pacific Railroad, among other things, provide:

"Sec. 3. And be it further enacted, that there be, and hereby is, granted to the 'Northern Pacific Railroad Company,' its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile,

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

on each side of said railroad line, as said company may adopt, through the territories of the United States. * * *

"Sec. 11. And be it further enacted, that said Northern Pacific Railroad, or any part thereof, shall be a post route and a military road, subject to the use of the United States, for postal, military, naval, and all other government service, and also subject to such regulations as Congress may impose restricting the charges for, such government transportation. * * *

"Sec. 15. And be it further enacted, * * * the directors, * * * shall have full power to make and prescribe such by-laws, rules, and regulations as they shall deem needful and proper touching the disposition and management of the stock, property, estate, and effects of the company, * * * and all matters whatsoever which may appertain to the concerns of said company."

In 1887 the Northern Pacific Railroad was constructed over the Cascade Mountains to Tacoma, thereby acquiring west of the Cascades, under the grant, the odd sections of land within the grant limits, most of which lands were heavily timbered.

The railroad freight traffic in 1888 was mainly west-bound; it was desirable that east-bound freight traffic be developed. In part to that end, a contract was entered into between the Northern Pacific Railroad Company, predecessor in interest of the defendant, and the organizers of the complainant company. This contract in part provides:

"Whereas, the company is the owner of certain lands in the county of Pierce in the territory of Washington, south of the Cascade Division of the Northern Pacific Railroad, of which the lands hereinafter described are a part, and which are not, and cannot be made, accessible or available unless a railway or railways be constructed to and through the same, substantially as hereinafter provided; and whereas, the construction of such railway or railways would largely tend to the benefit and advantage of the company and of the holders of its bonds and stock, by reason of the increased value of its said lands other than those hereinafter mentioned and described, and also by reason of the increase of the traffic of the railroad of the company, thereby to ensue: * * *

"The company agrees to sell, and it does hereby sell, to the purchasers, for the price and on the conditions and terms hereinafter named, all of the merchantable red and yellow fir, cedar, and spruce standing and being upon the lands next hereinafter described, and now available or accessible, or which by the construction of railroads, logging roads, or other customary means, without requiring unreasonable or excessive expenditures, can be made available or accessible, at and for the price of fifty (50) cents per thousand feet, board measure, stumpage, for all the red and yellow fir, cedar, and spruce now standing and being on said lands, and now accessible or available, or that can be made accessible or available, as aforesaid, and that will cut into merchantable logs of twenty-four (24) feet in length, and measuring at the smaller end of the top log 16 inches or over. * * *

"The company agrees to sell to the purchasers, for the price and on the terms and conditions hereinafter named and stated, and when and as, but not before, substantially all the merchantable red and yellow fir, cedar, and spruce shall have been cut therefrom, the lands of the company containing timber of the descriptions and character and situated as aforesaid, to the amount of, but not exceeding, eighty thousand (80,000) acres, and acquired by it from the United States by the said act of Congress and the amendments or supplements thereto, * * * or so much of said quantity of lands, of the descriptions and character, and situated, as herein described, as shall be found to be in the sections of land hereinbefore specified, for a price of one dollar and twenty-five cents ($1.25) for each and every acre of said lands, according to the United States government survey, to be paid as hereinafter specified. * * *

"In consideration of the premises, and of the other covenants and agreements of the company herein contained, the purchasers jointly and severally hereby covenant and agree to and with the company that they shall and will, and they do hereby, purchase from the company all the merchantable red and yellow fir, cedar, and spruce timber of the character hereinbefore mentioned now standing and being on said land, and, when and as such timbers shall be substantially cut therefrom, they shall and will buy the said lands, and shall and will pay to the proper offices or agent of the company for said timber and for said lands, respectively, the several prices above mentioned, at the times and in the manner following, that is to say:

"(a) After the acreage of the said now surveyed lands shall have been ascertained as aforesaid the purchasers shall pay to the proper officer or agent of the company, upon and on account of the said timber and lands, respectively, an amount in money equal to three dollars ($3.00) for each and every acre, according to the government survey, of the said now surveyed timber lands at the times following, namely: * * *

"(c) The difference between the amounts of one dollar and twenty-five cents ($1.25) and three dollars ($3.00) per acre of said lands is to be allowed and applied, from time to time as the acreage is ascertained, as payments on account of the timber. The remainder of the said price of fifty (50) cents per thousand feet of the timber aforesaid shall be paid as follows: The purchasers shall and will, at their sole cost, charge, and expense, construct, complete, furnish, and equip (except rolling stock) a railroad of standard gauge from a point, to be determined by the chief engineer of the company, at or near Orting station on the Cascade Division of the Northern Pacific Railroad, thence in a generally southerly direction to the Nisqually river. * * *

"In case the actual cost of the construction and completion of said railroad and branch, with ten (10) per cent. added thereto, shall exceed the amount of the said price of fifty cents per thousand feet of timber, of the descriptions and character aforesaid, on all the said lands, less the sum and amount of one dollar and seventy-five cents ($1.75) per acre of all said lands, to be allowed and applied, as aforesaid, as payments on account of the purchase price of said timber as hereinbefore provided, the company will pay to the purchasers the difference, by crediting them with the amount of said difference one-half of the rates and charges for transportation to be performed by the company for the purchasers, and not otherwise. And in case the said price of all said timber, less the said sum and amount of one dollar and seventy-five cents per acre of all said lands, to be allowed and applied as aforesaid, shall exceed the actual cost of the construction of said railroad and branch, and ten per cent. added thereto, the purchasers shall pay to the company the amount of such excess in money. * * *

"The purchasers, for the consideration aforesaid, hereby further, jointly and severally, covenant, promise, and agree to and with the company that they shall and will well and truly, and in due season, pay all taxes and assessments that shall be levied or assessed upon the said lands, after the date of this contract. It is mutually agreed by and between the parties hereto that at all times during the continuance in force of this contract, and until the delivery of deeds of the lands as herein provided, the purchasers, complying with and performing the covenants, agreements, and terms of this contract on their part, shall have the sole and exclusive possession of the lands embraced in this contract, except such portions thereof as shall be used for the purpose of said railroad and branch, as tenants thereof under the company; the purchasers hereby agreeing not to commit waste upon said lands, and not to cut thereon or remove therefrom any timber except under the provisions of this contract, and further to pay to the Company, as a reserved rent for said lands during said period, the sum of one dollar annually. And the parties hereto do now and hereby respectively lease and hire said lands accordingly.

"The foregoing agreement on the part of the company to sell said timber, and to lease and sell the said lands, to the purchasers, are upon the express conditions following, that is to say:

"(I) That they, the purchasers, shall and will, well and truly, at the times and in the manner herein specified, make the payments aforesaid, namely, an amount in money equal to three dollars ($3.00) per acre of the lands hereby agreed to be sold, with interest as aforesaid, and construct and complete said railroad and branch as hereinbefore provided.

"(II) That the purchasers shall erect at Tacoma, in said county of Pierce, on Puget's Sound, on a tract known as 'The Boot,' as speedily as possible, within twelve (12) months from the date of this contract, a sawmill to cut lumber for the eastern and local markets, having a capacity to cut at least thirty million (30,000,000) feet, board measure, of logs per annum.

"(III) That within twenty-four (24) months from the date of this contract that they shall also erect, at a suitable point in said Tacoma, another sawmill, with a capacity of at least sixty million (60,000,000) feet annually.

"(IV) That in each year after the year eighteen hundred and eighty-nine the purchasers shall cut on said lands at least seventy-five million (75,000,000) feet of timber of the descriptions and character aforesaid, and ship the lumber manufactured therefrom over the Northern Pacific Railroad, as hereinafter provided.

"The company covenants and agrees, to and with the purchasers, that it shall and will transport the logs of the purchasers cut on said lands, or upon adjacent lands of the purchasers, when delivered free on board the cars of the company at any point or points on said railroad to be constructed as aforesaid, or on the Cascade Division of the Northern Pacific Railroad, south of the crossing of the Green river, or any other road or branch that may be constructed on or through said lands and operated by the company, to Tacoma, at the rate of one dollar per thousand feet, board measure; the company furnishing all rolling stock, and the purchasers to load and unload the cars. But if the company shall so require the purchasers shall furnish the cars or trucks, the cost thereof to be reimbursed to them by credits to the amount thereof of one-half the rates of transportation of the logs; and the company agrees that the rates of freight on lumber and other products of said timber, from Tacoma to points north of the latitude of St. Louis Missouri, shall be as low as from Portland, Oregon, to the same points.

"The purchasers further hereby, jointly and severally, covenant and agree to and with the company that they shall ship at least sixty (60) per cent. of the lumber manufactured from the timber cut on the lands aforesaid to points east on the Northern Pacific Railroad and beyond: Provided that the company shall, so far as it lawfully may, fix such rates and charges for transportation as will enable the purchasers to compete, in the interior and Mississippi Valley lumber markets, with the lumber districts of Minnesota and Wisconsin, and, further, that in case the rates and charges of the company for said transportation, and the cost of manufacturing and marketing such lumber, will not enable the purchasers to compete in said markets, and afford them a profit of fifteen (15) per cent. on the actual cost, on the cars at the mill, of the lumber so shipped and transported to interior and Mississippi Valley markets, then in such case, while that condition or state of things exist, the purchasers shall not be obliged to cut any timber on said lands, except at their own option, but in no event, while such condition or state of things exist, shall they cut on said lands more than forty million (40,000,000) feet per annum.

"The company covenants and agrees that when, and from time to time, as the purchasers shall have cut substantially all the timber of the descriptions and character aforesaid on at least two thousand (2,000) acres of said lands, and shall have manufactured the same into lumber and shipped it as in this contract provided, and shall have fully paid to the company the said amount of three dollars per acre of said lands, with interest as hereinbefore specified, and shall have expended, in the actual construction of said railroad or branch, money sufficient to pay in full the remainder of the purchase price of the timber now on said two thousand (2,000) or more acres of lands, according to the terms of this contract, at least one hundred and twenty-five thousand dollars ($125,000) more, it, the company, shall and will, on request of the purchasers or within a reasonable time thereafter, convey

296 F.—48

such lands to them in fee simple absolute by good and valid deeds in the law, with the usual covenants of warranty, free from the lien of any mortgage made by the company.

"The purchasers covenant and agree that they will not cut any timber on any tract or parcel of land embraced in this contract, unless, not until, the acreage of such tract or parcel, and also the quantity of said timber thereon, shall have been ascertained, fixed, and determined in the manner and at the times hereinbefore specified. * * *

"It is hereby mutually covenanted and agreed that, in case any difference shall arise between the parties hereto concerning the true meaning and construction of this contract, or any of the provisions thereof, or concerning the operations of the parties under the same, and if the parties shall fail to agree as to such matters of difference, the same shall be submitted to two competent and disinterested arbitrators, one to be chosen on the part of each party, and if they fail to agree the persons so chosen shall select another arbitrator, and the finding or award of any two of the arbitrators so chosen or selected shall be final and conclusive on the parties hereto with respect to the questions or matters of difference so submitted to arbitration. And it is further mutually agreed that any difference that may arise as to the construction of, or transaction of business under, the provisions of this contract, or any of them, shall not interrupt the transaction of such business, and such business shall continue to be transacted and settlements and payments therefor made in the same manner in which the same has been transacted and made prior to the arising of such difference, until the matters of difference shall be finally determined by arbitrators, as hereinbefore provided, and thereupon such payments, or restitutions, shall be made by the respective parties as may be required by the decision of the arbitrators."

This contract has been modified by subsequent agreements in particulars not important to the present controversy. It is admitted that the income of the defendant from sources attributable to its granted lands now exceeds $10,000,000 yearly. Complainant, in pursuance of the contract, built the branch line, constructed the mills, and paid the taxes upon the contract lands.

Under government control, during the late war, the rate for hauling logs from the lands in question to the mill was increased. The Transportation Act of 1920 (41 Stat. 457 [Comp. St. Ann. Supp. 1923, § 10071¼a et seq.]) terminated March 1, 1920, federal control of defendant's road. Rates were by its terms (section 208, page 464) continued in effect until changed by federal or state authority; it also amended section 13 of the Interstate Commerce Act to cover discriminations against interstate commerce by intrastate rates (section 416, page 484 [Comp. St. Ann. Supp. 1923, § 8581]). Pursuant to this act the Interstate Commerce Commission ordered a 25 per cent. increase of rates in the Mountain-Pacific group of railroads, effective August 26, 1920. Pursuant to said order the department of public works of the state of Washington increased all intrastate rates 25 per cent., including the log rate, as already increased 25 per cent. by the Director General of Railroads, so that since August 26, 1920, complainant has had to pay $1.56½ per thousand on its logs shipped, instead of the $1 contract rate. The department of public works, upon its own complaint, investigated the reasonableness of log rates in the state of Washington, which investigation resulted in an order that the railroad carriers cancel all contract log rates, and further increase the rate applicable to complainant's shipments. Complainant was not a party to the proceeding. The defendant, and other railroad carriers who were par-

ties, contended for higher rates than those ordered. Upon a writ of review sued out by the carriers the order of the department of public works was affirmed by the superior court of Thurston county, and pending the present suit, the Supreme Court of the state has affirmed such decision. Northern Pacific Railway v. Department of Public Works (Wash.) 217 Pac. 507.

[1] It is by complainant contended that the above-quoted sections of the act incorporating the Northern Pacific Railroad show that Congress in making the grant was exercising its war power and that authority which, by the Constitution, is vested in it over postal affairs, and that, the contract here in question being made under such grant, with the object of the development of a balanced freight traffic, that thereby the log freight rate of the contract was withheld from the regulatory police power of the state of Washington thereafter created; that an intent that such contract should not be affected by an exercise of such power is shown by section 1 of article 27 of the state Constitution. This position is untenable. It may be conceded that Congress, under its war power, could have created a railroad corporation, freed from the state's police power and free from regulation under the commerce clause of the Constitution; but before it could be held to have done so the intention of Congress so to do would have to be most clearly shown. Such is not the fact in the present instance. By section 20 of the act incorporating the Northern Pacific Railroad it is provided:

"Sec. 20. And be it further enacted, that the better to accomplish the object of this act, namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times (but particularly in time of war) the use and benefits of the same for postal, military, and other purposes, Congress may, at any time, having due regard for the rights of said Northern Pacific Railroad Company, add to, alter, amend, or repeal this act."

No intention is here shown to serve the public interest and welfare other than it would ordinarily be served in the regulation of any railroad. The right reserved to amend was evidently all that was deemed necessary.

[2] Section 1 of article 27 of the state Constitution provides:

"In order that no inconvenience may arise by reason of a change from a territorial to a state government it is hereby declared and ordained as follows:—

"Section 1. *Existing Rights, Actions and Contracts Saved.*—No existing rights, actions, suits, proceedings, contracts, or claims shall be affected by a change in the form of government, but all shall continue as if no such change had taken place; and all process which may have been issued under the authority of the territory of Washington previous to its admission into the Union shall be as valid as if issued in the name of the state."

No such clear and positive disclaimer or renunciation of the exercise of the police power over such contracts as the one now in question is here shown as would warrant the court in holding that such was its effect. By this article it was intended to preserve the status quo pending the enactment of laws in the organization of the government of the new state. That such was the purpose is clearly shown by the other sections of this article.

[3] It is further contended that, the log rate being for an intrastate haul, and that having been made before the admission of the state, and of course before the enactment of the Public Service Commission Law, that it is, under the decisions of the Supreme Court of the state of Washington, saved from the operation of such law, and the police power of the state, over the prior contract rate, and that the order of the board of public works, if held applicable to such a contract, works an impairment of the obligations created thereby. The effect of the Transportation Act of 1920, and the order of the Interstate Commerce Commission, Ex parte 74, 58 Interst. Com. Com'n, 220, directing the 25 per cent. increase over existing rates, upon the order of the board of public works will not be considered, as the question has not been discussed in briefs, or upon argument. Railroad Commission of Wis. et al. v. Chicago, B. & Q. Ry. Co., 257 U. S. 563, 42 Sup. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086.

Allen v. Railroad Commission of California, 179 Cal. 68, 175 Pac. 466, 8 A. L. R. 249, was a case where the contract rate for water for irrigation purposes was not made with a functioning public service corporation, but one by which it was enabled to become such. In this respect the case is similar to State of Washington ex rel. Raymond Light & Water Co. v. Public Service Commission, 83 Wash. 130, 145 Pac. 215, and Sunset Shingle Co. v. Northwest Elec. & Water Wks., 118 Wash. 416, 203 Pac. 978. In each case the contract for the rate underlaid the public service. The decision in Santa Fé Prescott & Phœnix Ry. Co. v. Grant Bros. Con. Co., 228 U. S. 177, 33 Sup. Ct. 474, 57 L. Ed. 787, is not different in principle. If the rate contracted for in the present case was one confined to the logging road which complainant contracted to build to and through the acquired timber lands, the foregoing cases would more nearly support complainant's contention. Such a contract, it could more plausibly be contended, was in the nature of a private contract, beyond the police power. But the $1 per thousand log rate being joint in its nature, in that it included the haul not only over the road to be constructed by complainant, but over the road already constructed by the Northern Pacific Railroad, it is a public contract and within the police power of the state. By what has been said it is not meant to concede that any part of the contract here in question is private, or that if it was that it would not be subject to the state's police power. Santa Fé, etc., Ry. v. Grant Bros., etc., 228 U. S. 177, 33 Sup. Ct. 474, 57 L. Ed. 787; Union Dry Goods Co. v. Georgia Public Service Commission, 248 U. S. 372, 39 Sup. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420; Producers', etc., Co. v. Railroad Commission, etc., 251 U. S. 228, 40 Sup. Ct. 131, 64 L. Ed. 239.

Section 6 of the Interstate Commerce Act of June 29, 1906, as amended (Compiled Statutes, § 8569, subsec. 7), provides:

"No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, be-

tween the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs: Provided, that wherever the word 'carrier' occurs in this act it shall be held to mean 'common carrier.'"

In Armour Packing Co. v. United States, 209 U. S. 56–80, 28 Sup. Ct. 428, 52 L. Ed. 681, it was held that the purpose of the act was to require shippers to be treated alike; that there was nothing in the act to save special contracts, or contracts for a rate legal when made, from being affected by a subsequent change of rate. In Louisville, etc., v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671, where a railroad in 1871, before the enactment of the Interstate Commerce Act of 1887 (Comp. St. § 8563 et seq.), in consideration of a release from all liability for damages on account of injuries received, had contracted to grant the injured parties life passes over its line, suit was brought by such parties for specific performance. The railroad's defense was the provision of the Interstate Commerce Act of 1906. The court in upholding defendant's contention points out that, while the act of 1887 prohibited a carrier from receiving from any person "a greater or less compensation" for any services rendered for transportation than that demanded or received from others, the act of 1906, amending the act of 1887, prohibited the demanding, collecting, or receiving "of a greater or less or different compensation." The court held that the compensation of the contract was "different in kind" from the scheduled rates, saying:

"And it cannot be doubted that the rates or charges specified in such schedules were payable only in money."

The court expressed no opinion upon the question of whether the losing parties might recover in another form of action. Such was the recent holding of the Supreme Court in Ortega Co. v. Triay, etc. (No. 75, October Term, 1922, Nov. 13, 1922) 260 U. S. 103, 43 Sup. Ct. 44, 67 L. Ed. 153.

Section 18 of the Public Service Commission Law of Washington of 1911 (section 10354, Remington's Compiled Statutes) provides:

"No common carrier shall charge, demand, collect or receive a greater or less or different compensation for transportation of persons or property, or for any service in connection therewith, than the rates, fares and charges applicable to such transportation as specified in its schedules filed and in effect at the time; nor shall any such carrier refund or remit in any manner or by any device any portion of the rates, fares, or charges so specified excepting upon order of the commission as hereinafter provided, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property except such as are regularly and uniformly extended to all persons and corporations under like circumstances."

Other applicable sections of the Washington law are sections 10345, 10350, 10356, and 10357. Cowley v. Northern Pacific Ry., 68 Wash. 558, 123 Pac. 998, 41 L. R. A. (N. S.) 559, is a case very similar to the Mottley Case. The contract in this case was made in 1898 in consideration of a conveyance of real estate to the railroad, for which plaintiff, his wife and children, were to receive passes over defendant's

entire system. The defendant performed its contract until the taking effect of the Interstate Commerce Act of 1906 (34 Stat. 584). The court, in refusing a rescission of the contract and denying damages, said:

"These observations apply with equal force to both questions, viz., the right of the plaintiff to a rescission and a reconveyance, and his right to damages. The plaintiff conveyed the property to the defendant upon the faith of defendant's promise to perform conditions which were then wholly lawful but which, after a substantial part performance, became unlawful without any contributing cause upon the part of either party. The full performance has not been arrested by any act or omission of the defendant, but by the Congress of the United States acting within its constitutional powers. It follows from what has been said, that the defendant cannot be mulcted in damages because of, and only because of, its observance of a law making further performance of the contract on its part impossible."

In so deciding the Washington court quotes and relies upon the following from the decisions of the Supreme Court in the Mottley Case:

"The agreement between the railroad company and the Mottleys must necessarily be regarded as having been made subject to the possibility that, at some future time, Congress might so exert its whole constitutional power in regulating interstate commerce as to render that agreement unenforcible or to impair its value. That the exercise of such power may be hampered or restricted to any extent by contracts previously made between individuals or corporations is inconceivable. The framers of the Constitution never intended any such state of things to exist. * * * After the Commerce Act came into effect, no contract that was inconsistent with the regulations established by the act of Congress could be enforced in any court. * * * We forbear any further citation of authorities. They are numerous and are all one way. They support the view that, as the contract in question would have been illegal if made after the passage of the Commerce Act, it cannot now be enforced against the railroad company, even though valid when made."

Complainant in the present case seeks to avoid the effect of these decisions upon two grounds: First, because of the holding in the earlier case of Sultan Ry. & Timber Co. v. Great Northern Ry., 58 Wash. 604, 109 Pac. 320, 1020; second, because in the Cowley Case the Washington court was considering the Interstate Commerce Act, and not section 18 of the act of 1911 (Laws 1911, p. 551).

In Sultan Ry., etc., v. Great Northern, a logging company was insisting upon its right to cross, with a logging road, at grade the track of defendant railway. The differences were adjusted in 1904, by the defendant railroad agreeing to carry plaintiff's logs at a certain rate. This case was decided in 1910, at the time when section 18 of the act of 1911 read as did 'section 6 of the Interstate Commerce Act of 1887, prohibiting the receiving of "a greater or less compensation" for carriage than that paid by others. In this case, in upholding a judgment for damage against the railroad because of its canceling the contract and refusing to perform the agreement, the court said:

"The acts of the Legislature of this state establishing a railroad commission and providing for the regulation of freights and fares will be found in the statutes. Laws 1905, p. 145; Laws 1907, p. 536; 'and Laws 1909, p. 191 (Rem. & Bal. Code, § 8627 et seq.). The acts are too long even to epitomize here, but it will be found upon examination that they do not in terms prohibit a railway company, except in certain specified cases, from changing or altering its tariff rates at any time it deems the reason sufficient, nor from enter-

ing into a contract with an individual shipper to carry particular goods at a fixed rate for a given time or to the amount of a given quantity. The prohibition is against discriminations, against the hauling of one man's goods at a more favorable rate than it will haul another's and against extortionate and unreasonable charges, but it does not purport to prohibit the railway company from giving a shipper a binding assurance that tariff rates on a given commodity will not be changed before the end of a fixed period, or before a given commodity has been shipped. The effect of the statute in this respect is similar to that of the Interstate Commerce Act concerning which the Supreme Court of the United States in Cincinnati, etc., R. Co. v. Interstate Commerce Commission, 162 U. S. 184, said: 'Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at the common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are regarded as sound, and adopted in other trades and pursuits.'

"It is true that in a certain sense there are three parties to contracts of this nature, the carrier, the shipper, and the state. The interest of the first two is at once apparent; that of the latter consists in seeing that the contract is not discriminatory or oppressive on the shipper, or so far improvident on the part of the carrier as to impoverish it and thus prevent it from performing its functions as a carrier. But subject to these requirements we see no reason why the railway company may not now contract for the carriage of freights as freely as it was wont to do before the passage of the commission acts. The record fails to show that the contract in question is in any manner discriminatory or extortionate, or that it is unduly oppressive on the carrier. As we have said elsewhere, the record is silent on these matters, other than it was shown that the company had established a public rate between these points considerably higher than the contract rate. But this is not sufficient to justify the court in setting aside the contract rate on the ground of its inadequacy. While in a contract between the carrier and a member of the general public over the reasonableness of a freight charge it would be some evidence of the justness of the charge, conclusive perhaps in the absence of any other showing, to show that the rate exacted was the published rate and the rate charged every one for a similar service, it is not evidence when the purpose is to set aside a rate created by contract. As between the carrier and the other party to the contract the carrier must establish its claim of invalidity by direct evidence of the fact.

"It is unnecessary in this proceeding that we consider the effect of the contract on rates to be charged to other shippers desiring to ship between the same points. Since the railway company is forbidden to discriminate in its charges between shippers, it could not, of course, charge other shippers a greater rate than the contract rate for a like or similar service. But this does not necessarily mean that the rate charged must be the contract rate. It will be remembered the respondent, as an inducement to the contract, surrendered a right, and it may be that the value of the surrendered right can be taken into consideration in fixing the public rate, but this question we expressly refuse to decide."

From the foregoing it is clear that the court treated the increase in the rate over the contract rate as the voluntary act of the carrier. In that case there had been no rate fixed by public authority, as in the present case. The case is, therefore, materially different from the present suit, where both the Interstate Commerce Commission and the department of public works have ordered an increase in rates, and the latter has fixed a log rate which the general shipper must pay. This is shown by the following from the foregoing decision:

"Since the railway company is forbidden to discriminate in its charges between shippers, it could not, of course, charge other shippers a greater rate than the contract rate for a like or similar service."

It will also be seen that the court expressly declined to rule upon the question of whether the value of the surrendered right—that is, the claimed right to cross defendant's road at grade—could be taken into account in fixing the "public" rate. Upon a rehearing en banc, the court said:

"A petition for a hearing en banc has been filed in this case, in which the appellant earnestly insists that our former opinion is in direct conflict with the decision of the Supreme Court of the United States in the case of Armour Packing Co. v. United States, 209 U. S. 56. It seems to us, however, that this case is readily distinguishable from the case cited, on two grounds: First, because there was here a consideration for the contract, in addition to and independent of the freight rate agreed upon, so that the rate is not necessarily discriminatory; and, second, because the contract was entered into before the passage of the Railroad Commission Act and the amendments thereto, and there is nothing in the latter acts tending to show that the Legislature intended to abrogate previously existing valid contracts, conceding that it had the constitutional power to do so. The petition is therefore denied."

The Washington court distinguishes the case from the Armour Packing Company Case by holding that discrimination was avoided by the payment, in part, for its log transportation by plaintiff's surrendered claim of right to cross defendant's track at grade. If it be conceded that this could be done under the statute (section 18, as it then read), it is no longer true since the amendment of 1911, whereby not only was there a prohibition against receiving a "greater or less" compensation for transportation than that collected from others, but any "different" compensation was also forbidden. With this change in the statute, the contract rate cannot be upheld and at the same time discrimination between shippers avoided. Louisville, etc., R. R. Co. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; New York, etc., R. R. Co. v. Interstate Commerce Commission, 200 U. S. 361, 26 Sup. Ct. 272, 50 L. Ed. 515.

This decision of the Washington Supreme Court was considered by it in Raymond Lbr. Co. v. Raymond L. & W. Co., 92 Wash. 330, 159 Pac. 133, L. R. A. 1917C, 574. This was a suit for damages because a water company refused to furnish water at the contract rate, after the Public Service Commission had found the contract resulted in discriminating rates and directed its cancellation. The contract had been made before the passage of the Public Service Commission law. It was there contended that, the contract being valid when made, it could not be abrogated under the provisions of the law subsequently enacted. The court, however, rejects this contention, citing in support of its ruling Portland Ry., L. & P. Co. v. Railroad Commission of Ore., 229 U. S. 397, 33 Sup. Ct. 820, 57 L. Ed. 1248; Milwaukee Electric Ry. & L. Co. v. Railroad Commission of Wisconsin, 238 U. S. 174, 35 Sup. Ct. 820, 59 L. Ed. 1254; Chicago, etc., R. R. Co. v. Nebraska, etc., 170 U. S. 57, 18 Sup. Ct. 513, 42 L. Ed. 948; Louisville & Nashville R. R. Co. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34

L. R. A. (N. S.) 671; Philadelphia, etc., R. R. Co. v. Schubert, 224 U. S. 603, 32 Sup. Ct. 589, 56 L. Ed. 911. In so holding the court said:

"This contention cannot be sustained. The rule is that contracts upon subjects which are within the police power, even though valid when made, must be taken to have been entered into in view of the continuing power of the state to control the rates to be charged by public service corporations."

[4] Evidently in answer to the same argument which has been made in the present suit, in seeking to avoid the effect of the Mottley and Cowley Cases on the ground that they were both decided under the Interstate Commerce Act, the Washington court says:

"It will be noticed that two of the cases cited and quoted from are based upon the commerce clause of the federal Constitution. But the principle is the same. The commerce clause of the Constitution is a delegation of power to the United States. The, federal Supreme Curt holds that contracts valid when entered into are made subject to the subsequent exercise of the power of Congress. The police power of the state is not a delegated, but a reserved, power. The cases of Chicago, B. & Q. R. Co. v. Nebraska ex rel. Omaha and Milwaukee Elec. R. & Light Co. v. Railroad Commission of Wisconsin, supra, are cases involving the exercise of the police power of the state; and the rule is the same, whether the contract be one which is within the commerce clause of the federal Constitution or one which is within the police power of the state. In one case, it is subject to the laws subsequently passed by Congress; and in the other, it is subject to the laws subsequently passed by the state Legislature. The clause of the federal Constitution which provides that no law shall be passed which impairs the obligation of a contract is not applicable to legislation within the scope of the police power."

The court in this case distinguishes Sultan Ry. & Timber Co. v. Great Northern Ry. Co., 58 Wash. 604, 109 Pac. 320, 1020, upon the ground already pointed out; that is, that upon rehearing in the Sultan Case the court expressly held that a discriminatory rate had not been shown to result from the contract merely because the published rate was higher than the contract rate, as there was an additional consideration for the contract rate. It is true that in Sunset Shingle Co. v. Northwest Elec. & Water Works, 118 Wash. 416, 428, 429, 430, 203 Pac. 978, the court distinguishes the Raymond Lumber Co. Case, 92 Wash. 330, 159 Pac. 133, L. R. A. 1917C, 574, but it is upon the ground that the contract there was a pure public service. In this case the court also approves the Sultan Lbr. Co. Case, but upon a point not important to the present inquiry.

The court in the present suit is asked to distinguish the Raymond Lbr. Co. Case because of a difference in the statute regulating water companies from that applicable to carriers. The following quoted section of the statute is one applicable to water, gas, and electric companies, and there is no corresponding provision of the statute applicable to carriers. Section 10370, Rem. Comp. Stat., provides:

"Existing Contracts—Effect. Nothing in this act shall be construed to prevent any gas company, electrical company or water company from continuing to furnish its product or the use of its lines, equipment or service under any contract or contracts in force at the date this act takes effect, or upon the taking effect of any schedule or schedules of rates subsequently filed with the commission, as herein provided, at the rates fixed in such contract or contracts: Provided, that the commission shall have power, in its discretion, to direct by order that such contract or contracts shall be terminated by the company party thereto, and thereupon such contract or contracts shall be,

terminated by such company as and when directed by such order: Pro-
.vided further, that the commission shall have no power to order the termina-
tion of any contract relating to the furnishing of water for irrigation or ir-
rigation and domestic use, where such contract is based upon a considera-
tion passing at the time of the execution of such contract."

While this section provides the manner in which the commission shall
direct the termination of a pre-existing contract, the effect of this stat-
ute is to save existing contracts for gas, electric, and water service
from being abrogated by the act until action is taken by the commis-
sion, and not, as has been argued, solely as a grant of authority to the
commission. The adoption of such saving clause in the case of water,
gas, and electric service corporations, and not in the case of a railroad,
therefore shows rather an intent on the part of the Legislature to ter-
minate pre-existing contracts for service by railroad when the same
are at variance with the provisions of the statutes or the rates estab-
lished in pursuance of them. In New York, etc., R. R. Co. v. Gray, 239
U. S. 583, 36 Sup. Ct. 176, 60 L. Ed. 451, recovery of the value of the
right lost upon abrogation of a contract by a statute (the Hepburn Act)
was upheld upon the ground that such was the rule under the state law,
and upon the further ground that the judgment affirmed only required
the railroad to pay for something long before received by it under a con-
tract valid when made. In so holding the court was simply adminis-
tering the applicable principles of law and did not run counter to
the act of Congress:

"If the court had accorded legal efficacy to an executory contract made
after the taking effect of the Hepburn Act and contrary to its provisions, a
different question would be presented. * * *"

In this respect the case is similar in principle to Ortega Co. v. Triay,
in which case the Supreme Court approves L. & N. Railway Company
v. Crowe, 156 Ky. 27, 160 S. W. 759, 49 L. R. A. (N. S.) 848, which
latter case disapproves of the holding in Cowley v. Northern Pacific
Railroad Co., supra. The present case differs from both the foregoing,
for the railroad has not received all consideration for the carriage of the
logs, if the contract is to be upheld, for it would be paid $1 per thou-
sand for logs carried. In Walla Walla City v. Walla Walla Water Co.,
172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341, and Los Angeles v. Los An-
geles City Water Co., 177 U. S. 558, 20 Sup. Ct. 736, 44 L. Ed. 886, the
cities each sought to alter one of the terms of its own contract. The
prayer for specific performance will be denied complainant. Union
Dry Goods Co. v. Georgia Pub. Service Corp., 248 U. S. 372, 39 Sup.
Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420; Producers' Trans. Co. v. R. R.
Com. of California, 251 U. S. 228, 40 Sup. Ct. 131, 64 L. Ed. 239; N.
Y. C. & H. R. Ry. Co. v. Gray, 239 U. S. 583, 36 Sup. Ct. 176, 60 L.
Ed. 451.

[5] Complainant has asked damages in the alternative, which prayer
will also be denied. Cowley v. Northern Pacific Ry., 68 Wash. 558,
123 Pac. 998, 41 L. R. A. (N. S.) 559; Raymond Lbr. Co. v. Raymond
L. & W. Co., 92 Wash. 330, 159 Pac. 133, L. R. A. 1917C, 574. It is
true that the foregoing case was based upon the Interstate Commerce
Act, but the court denied, not only a rescission of the contract, made

invalid by the Interstate Commerce Act, but denied any damage for the loss of the advantage accruing to plaintiff under the contract. The denial of any relief is a ruling, rather, upon the question of general law than one growing out of any particular provision of the Interstate Commerce Law. N. Y. C. & H. R. R. Co. v. Gray, 239 U. S. 583, 36 Sup. Ct. 176, 60 L. Ed. 451. In Raymond Lbr. Co. v. Raymond, L. & W. Co., 92 Wash. 330, 159 Pac. 133, L. R. A. 1917C, 574, performance of the contract was denied at the direction of the Public Service Commission. The contract was solely a contract governed by Washington law. In the trial court plaintiff recovered damage; the case was reversed by the Supreme Court and the action ordered dismissed.

Defendant has in its answer asserted a counterclaim, with a prayer for an accounting and injunctive relief. The counterclaim is based upon that part of the sixth paragraph of the contract, which provides:

"The purchasers further hereby, jointly and severally, covenant and agree to and with the company that they shall ship at least sixty (60) per cent. of the lumber manufactured from the timber cut on the lands aforesaid to points east on the Northern Pacific Railroad and beyond: Provided that the company shall, so far as it lawfully may fix such rates and charges for transportation as will enable the purchasers to compete, in the interior and Mississippi Valley lumber markets, with the lumber districts of Minnesota and Wisconsin, and, further, that in case the rates and charges of the Company for said transportation, and the cost of manufacturing and marketing such lumber, will not enable the purchasers to compete in said markets, and afford them a profit of fifteen (15) per cent. on the actual cost, on the cars at the mill, of the lumber so shipped and transported to interior and Mississippi Valley markets, then in such case, while that condition or state of things exist, the purchasers shall not be obliged to cut any timber on said lands, except at their own option, but in no event, while such condition or state of things exists, shall they cut on said lands more than forty million (40,000,000) feet per annum."

The evidence shows that while, at the time the contract was made, the railroad was striving to build up its carriage of east-bound freight, yet at present the empty cars are westbound rather than east-bound. Defendant asserts that complainant has, since 1918, failed to ship 60 per cent. of the lumber manufactured from the timber cut upon the lands sold. This part of the contract clearly contemplates an interstate carriage. Conceding that the log rate provision of the contract is separable, and that the valid provisions of the contract may be enforced, United States v. Phineas Bradley, etc., 10 Pet. 343, 9 L. Ed. 448; American Ry. Ex. Co. v. Lindenburg (No. 138, October Term, 1922, U. S. Supreme Court, January 8th, 1923) 260 U. S. 584, 43 Sup. Ct. 206, 67 L. Ed. 414, yet neither specific performance of this provision nor an accounting for past shortages in shipment, if any, should be allowed. The general rule is that the common carrier must serve the public without discrimination. Special contracts relating thereto have not been encouraged, and have often been held contrary to public policy. In general, it is the duty of the carrier to perform its duty without difference in terms or service, in the order in which application is made for the carriage, and to provide suitable cars, as required, upon reasonable notice. In the present instance complainant not only denies a shortage in the contracted yearly shipments of lumber, but avers that it was at times unable to secure cars, preventing shipment.

The· defendant denies any car shortage, and alleges that all cars were furnished in conformity with its rules.

[6] The agreement requiring complainant to ship 60 per cent. of the lumber from timber cut upon the lands, with certain exceptions not necessary to consider, implies that the defendant will supply the carriage for such shipments. The vice in enforcing such a provision is that the carrier, being obliged to furnish carriage to a certain specific amount, would be liable for damages if it failed. It would therefore have an incentive because of such contract liaiblity, and because of the profit resulting to it from the whole contract, to favor complainant in the matter of carriage to the prejudice of other shippers, particularly in times of car shortage. The carrier is therefore not bound to furnish the agreed carriage. In this respect the case is not different in principle from C. & A. R. R. Co. v. Kirby, 225 U. S. 155, 32 Sup. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A, 501. The railroad not being obliged to furnish the agreed carriage, complainant is not obliged to ship the agreed amount of lumber, for in this respect the agreement would be lacking in mutuality.

The defendant alleges a breach of the contract upon complainant's part in failing to cut yearly 75,000,000 feet of timber from the lands. A breach, if any, of this provision of the contract, has been waived by the defendant by accepting the purchase price for the lands. Further, the only damage defendant asserts because of such claim of breach is on account of complainant's failure to ship 60 per cent. of the timber cut. Having held this provision unenforceable, it follows that defendant has not been prejudiced by a failure, if any, to cut 75,000,000 feet yearly.

Defendant seeks to recover of complainant for quantities of hemlock, larch, pine, and· undersized fir, spruce, and cedar alleged to have been cut from the lands of defendant. The provisions of the contract pertinent to this question are above set out, and they are of too great length to justify repetition. The basis of defendant's claim is that the railroad, by the contract, only sold to complainant the "red and yellow fir, cedar, and spruce that would cut into logs 24 feet in length, 16 inches at the top," and that in disregard of this term of the contract the complainant has been cutting trees of the character last mentioned, smaller in dimension than those sold. Defendant's contention is untenable. The contract shows that in fixing the sale price of the different parcels of land included in the contract there was to be paid $1.25 per acre, and 50¢ per thousand for the red and yellow fir, cedar, and spruce of the designated size. The other timber was disregarded, and belongs to complainant.

[7] Complainant prays that it be decreed the contracted lands. The general rule is that the law will aid neither party to an illegal contract; that is, if they are in pari delicto. Interstate Commerce Act 1887, § 3, 24 Stat. p. 380, prohibits an interstate·carrier giving any unreasonable preference. The implied promise to carry 60 per cent. of the lumber from the logs cut the court has already held to be an unreasonable preference. Section 10 of the act declares it a misdemeanor for the carrier to give such preference, and does not make it a misdemeanor

upon the part of the shipper to receive such preference. The parties to such contract, under the law as it then existed, were not in pari delicto. Parkersburg v. Brown, 106 U. S. 487, 1 Sup. Ct. 442, 27 L. Ed. 238; 9 Cyc. 552, 553.

The complainant has long since paid the agreed price of the lands, unless it be because of its failure to ship the 60 per cent. of the lumber. It has paid the taxes and carrying charges since the execution of the contract. Defendant contends that complainant from the beginning has not complied with the 60 per cent. shipping provision. Defendant has never before sought to enforce it. Relatively, the equities are with complainant in this matter. No action being threatened by the defendant to deprive complainant of any advantage or benefit from the operation of the road, and carriage over it, no order will be made in that regard.

It is not necessary to consider, or determine, the question of the ultimate title of the right of way after the removal of the timber.

Decree accordingly.