HALIFAX PAPER COMPANY, INC., v. ROANOKE RAPIDS SANITARY DISTRICT, AND ROSEMARY MANUFACTURING COMPANY, A NORTH CAROLINA CORPORATION, APPEARING HEREIN FOR ITSELF AND ON BEHALF OF ITS ASSOCIATES, ROANOKE MILLS COMPANY AND PATTERSON MILLS COMPANY, INCORPORATED.

(Filed 11 October, 1950.)

1. **Appeal and Error § 6c (2)—**

    A sole exception to the signing of the judgment presents for review only whether the facts found are sufficient to support the judgment.

2. **Water Companies § 2: Utilities Commission § 1—**

    A sanitary district which, as a part of its functions, furnishes drinking water to the public and also filtered water for industrial consumers is a *quasi*-municipal corporation, G.S. 130-39, and is not under the control and

supervision of the North Carolina Utilities Commission as to services or rates, G.S. 62-30 (3).

**3. Water Companies §§ 3, 4—**

Defendant sanitary district was unable to raise funds for the construction of a filter plant and, in order to carry out the purposes for which it was created, leased a cotton mill's filter plant under an agreement that the mill should get its water at cost of filtering and should have priority over other industrial consumers. *Held:* The leased contract was in the public interest and the district had authority to execute it, G.S. 130-39 (7), G.S. 130-39 (9) (b), and the contract is valid since it does not impair the ability of the district to discharge its duties to the public nor unlawfully discriminate between commercial customers similarly circumstanced.

**4. Administrative Law § 3—**

Courts will not interfere with the exercise of discretionary powers conferred on local administrative boards for the public welfare except in cases of manifest abuse of discretion.

**5. Water Companies § 4—Similar treatment of commercial customers similarly circumstanced cannot constitute unlawful discrimination.**

Defendant sanitary district was unable to raise funds for the construction of a filter plant and, in order to carry out the purposes for which it was created, leased a cotton mill's filter plant under an agreement that the mill should get its water at cost of filtering and should have priority over other industrial consumers. Thereafter the district agreed with a paper mill to furnish it water from the surplus remaining after the needs of the district and lessor enterprise had been satisfied. *Held:* Upon increased demand by the lessor, resulting in a diminution of the surplus available for sale to other industrial consumers, the district had the power to reduce the amount of water furnished the paper mill proportionately, since the paper mill had no right to any water except out of surplus water remaining after the requirements of the district and the lessor enterprise had been satisfied, and since there was no discrimination in service to commercial users similarly circumstanced in regard to such surplus.

APPEAL by plaintiff from *Nimocks, J.,* at August Term, 1950, of HALIFAX.

A summary of the findings of fact in this case follows:

1. This is an action instituted by the plaintiff, Halifax Paper Company, Inc. (hereinafter referred to as Halifax), against Roanoke Rapids Sanitary District (hereinafter referred to as the District), to enjoin and restrain the District from diminishing the present supply of filtered water now being purchased from the District and used by Halifax in the prosecution of its business.

2. Halifax is a corporation with its principal office in Roanoke Rapids, N. C., and with its manufacturing plant within the District. It is engaged in the manufacture of paper, and requires in its manufacturing processes a large volume of filtered water.

3. The defendant District is a municipal corporation created by the North Carolina State Board of Health on 21 April, 1931, under the Public Laws of North Carolina, as codified and brought forward in G.S. 130-33, *et seq.,* and having the powers conferred by G.S. 130-39. Its boundaries embrace a large area within and contiguous to the Town of Roanoke Rapids. Said District was granted a franchise by Roanoke Rapids in 1932, giving it the right to lay its water and sewer lines and mains under and along the streets of said town.

4. The Rosemary Manufacturing Company (hereinafter referred to as Rosemary) is a corporation engaged in the cotton textile manufacturing business in North Carolina, with its principal place of business in Roanoke Rapids, N. C., and it, with its associates, Roanoke Mills Company and Patterson Mills Company, Inc. (hereinafter referred to as Textiles), are owned by the Simmons Company, manufacturers of mattresses and other domestic furnishings. After the Simmons Company obtained control of Textiles, Rosemary built the filter plant involved in this litigation, for the purpose of furnishing water to Textiles for industrial purposes only.

5. Rosemary intervened in this action on behalf of itself and its associates to protect its and their interest involved in this controversy.

6. At the time the District was created, it was unable to sell its bonds to the public, so as to construct a water and sewerage system in the District. However, in 1932, the District arranged to borrow $365,000.00 from the Reconstruction Finance Corporation, Washington, D. C., which amount was sufficient only to construct the water and sewerage system exclusive of a water filtering plant.

7. The District Board contacted Rosemary for the purpose of obtaining the surplus water of its plant for the District. Rosemary was willing to lease its filter plant to the District and did so under contracts, which are set out in full in the record and identified as Exhibits A and B. These contracts have been duly recorded in the office of the Register of Deeds in Halifax County.

8. The District being unable to sell sufficient bonds or otherwise obtain money sufficient to construct a filter plant to filter water for domestic, drinking, sanitary and fire-fighting purposes, the Board of said District, in good faith, and in the exercise of its discretion, entered into a written contract with the Intervener, Rosemary, to obtain the use of the surplus capacity of filtered water of Rosemary's existing filtration plant and then issued and sold to the Reconstruction Finance Corporation bonds sufficient to provide funds to construct the distribution and sewage disposal system for said District.

9. The original agreement, dated 1 August, 1932, between the District and Rosemary, provided for the lease of the filter plant to the District

for an annual rental of $2,700.00. The lease further provided that Rosemary and its associates should have priority to an uninterrupted supply of water sufficient for all their requirements for manufacturing and processing purposes on the following terms: "At cost to it computed on its overhead, cost of wages, power, chemicals, supplies, repairs, and all other costs incident thereto, exclusive of the amounts set forth in the first item hereof as rental, and which cost shall be prorated by the District and the Company on a basis of consumption, as shown by meters to be installed by the parties hereto, at the expense of each, and for which water supply the Company agrees to pay monthly for said water supply for the preceding month on or before the 10th day of the month succeeding the furnishing of said water. The District hereby agrees to and with the Company that it will, during the original and/or any renewal term of this lease enjoyed by the District, furnish to the Company and its associates, Roanoke Mills Company and Patterson Mills Company, Inc., at its connection and the connections of its associates at the plant said water for manufacturing and processing purposes for use of its plants at a cost not to exceed eight and one-fourth cents (8¼c) per one thousand (1,000) gallons."

10. The lease was for a period of three years, with an option on the part of the District to renew it for eleven terms of three years each. The District may cancel the lease by giving six (6) months' notice in advance of the expiration of any term of three years. The lease further provides that Rosemary shall not have the right to cancel the lease during the original term, or any renewal thereof, except upon nonpayment of rent by the District, or a breach of the District of any of the other terms, conditions and agreements agreed by, assumed and imposed upon it to be performed.

11. In the event the leased plant should prove to be insufficient to provide an adequate water supply to meet all the requirements of the District after supplying all the requisites of Rosemary and its associates, or should the cost of providing water of a quality and purity suitable and satisfactory for drinking purposes exceed 8¼c per 1,000 gallons then, in either of said events, the District has the right to cancel the lease by giving three months' written notice of its intention to do so.

12. The lease also provided for the plant to be operated by the personnel employed by Rosemary at the time the plant was taken over by the District, and it further provided that the District could not discharge an employee, employ additional personnel or change the salary of an employee without the consent of Rosemary.

13. In 1940, the filter plant became inadequate and upon advice of the engineers of the District and at the request of the District, Rosemary enlarged the filter plant at its own cost and expense to the capacity

recommended by said engineers as sufficient to take care of the needs and requirements of the District and Rosemary and its associates. The filter plant was enlarged to one and one-half times its then capacity.

14. After Rosemary enlarged the capacity of its filter plant in 1940, Rosemary and the District entered into a Supplemental Agreement modifying the original lease, in the following respects:

(a) The annual rental was reduced to one dollar.

(b) It was agreed to provide water first, to the District for drinking, household and fire-fighting purposes; second, to Rosemary and its associates, and third, to the other industrial consumers of the District out of the surplus of water.

(c) The personnel operating the plant was placed under the joint control of the District and Rosemary.

(d) It was agreed that the cost of filtering the water was to be prorated between Rosemary and the District on the basis of consumption. Otherwise the terms of the original lease remained in effect.

15. The filter plant in question has a capacity to filter a maximum of approximately 2,300,000 gallons of water per day, and at the time of the issuance of the injunction herein approximately 450,000 gallons was delivered from the filter plant daily to the District, approximately 1,500,000 gallons daily to Textiles, and approximately 350,000 gallons daily to Halifax.

16. The plaintiff has been taxed along with other property owners in the District, to pay principal and interest on the indebtedness of the District, but the plaintiff has contributed no sum whatsoever, as a taxpayer or otherwise, towards the construction of Rosemary's filter plant or the purchase of equipment used in connection with the same.

17. On 1 August, 1932, at the time the District entered into said agreement with Intervener, Rosemary, Halifax did not require any water from the District for industrial or manufacturing purposes, and did not ask for any water for such purpose until 6 July, 1937, at which time plaintiff requested the District to sell it water for industrial use not to exceed 85,000 gallons per day, and the District agreed to sell the plaintiff this amount of water from its surplus supply. Halifax, at the time of the institution of this action and for several months theretofore, had purchased approximately 350,000 gallons per day of filtered water from the District. Halifax has paid the District 12½c per 1,000 gallons of filtered water furnished to it since 1937. No other supply of filtered water is available to the plaintiff.

18. At the time the agreement was made between Rosemary and the District, 1 August, 1932, no industrial plant requested any filtered water from the District for industrial purposes. All manufacturing plants within the District had provided their own water supply for industrial purposes.

19. The District is not under any contract, except as set forth in finding of fact No. 17, to furnish the plaintiff with any supply of water for industrial purposes, nor has Halifax requested the District to enter into a contract to supply it with more than 85,000 gallons of water per day.

20. In the past, plaintiff has intimated that it would construct its own clear water facilities; however, the District has never declined to supply plaintiff with all filtered water available after first supplying the needs of the District and then the needs of Rosemary and associates, as per Supplemental Agreement of 1940 (Exhibit B).

21. Plaintiff knew Rosemary and associates were the sole owners of said filter plant, and in contemplation of constructing a filter plant of its own in 1944 negotiated with Rosemary for the purpose of purchasing 3.54 acres of land and later for the purchase of 7 acres of land adjoining the filter plant of Rosemary which Rosemary agreed to sell to plaintiff in 1945 for the sum of $100.00 per acre and to that end, on 16 August, prepared the necessary deed to convey said land, but plaintiff never requested said deed to be executed and delivered.

22. Prior to the institution of this action Rosemary notified the District that its water requirements for industrial purposes would be increased approximately 10% beginning 24 July, 1950. In turn the District notified Halifax that beginning with the above date it could not furnish it with water for industrial purposes in excess of 180,000 gallons per day.

23. It is stipulated in the record by counsel for the respective parties: If the contracts between the District and Rosemary are valid, then there is not sufficient filtered water available to supply the demands of the plaintiff in full after taking care first of the demands of the District, and second, the demands of Rosemary and associates.

24. The District has no source of water supply at this time other than from Rosemary's filter plant.

Upon the foregoing facts, his Honor concluded as a matter of law:

"I. The Roanoke Rapids Sanitary District was created pursuant to G.S. 130-33, *et seq.,* for the purpose of preserving and promoting the public health and sanitary welfare within the District.

"II. The Sanitary District Board was specifically authorized by statute to negotiate and enter into agreement with the owners of existing water supplies, sewerage systems or other such utilities as may be necessary to carry into effect the intent of the statute. G.S. 130-39 (5), (7).

"III. The Sanitary District was specifically authorized to contract with any person, firm or corporation, etc., to supply raw or filtered water to such person, firm or corporation, etc., where the service is available. G.S. 130-39 (9) (b).

"IV. Pursuant to statutory powers, the Board of the Sanitary District, in good faith and in the exercise of its sound judgment and discretion, executed the two contracts between the District and Rosemary Manufacturing Company appearing in the record, marked Exhibit A and Exhibit B. There is no evidence of abuse of discretion. The contract of 1 August, 1932, as amended, is reasonable and to the best interest and advantage of the Sanitary District, and is in aid of and consistent with the purposes for which the Sanitary District was created.

"V. The contract between the District and Rosemary Manufacturing Company, dated 1 August, 1932, as amended by the contract dated 30 September, 1940, is valid.

"VI. The plaintiff Halifax Paper Company has no contract with the District which would entitle the plaintiff to the supply of water for industrial use, as demanded in its complaint or to entitle the plaintiff to more than 85,000 gallons per day for industrial purposes out of such surplus of water as may be available.

"VII. The court having concluded that the 1932 contract between the District and Rosemary, as amended in 1940, is valid, it follows as a matter of law, under the stipulation of the parties hereto in the record, that there is not sufficient water available out of the surplus supply for industrial uses to supply the full demands for water for industrial purposes claimed and demanded by the plaintiff.

"VIII. The plaintiff is not entitled to a restraining order or a continuance of the injunction, as prayed for by the plaintiff.

"Wherefore, it is ordered that the restraining order and temporary injunction previously entered in this cause be, and it is hereby dissolved. This 4th day of September, 1950."

The plaintiff excepted to the signing of the judgment, and appealed.

*George C. Green and Lucas & Rand for plaintiff.*
*Kelly Jenkins and Lassiter, Leager & Walker for the District.*
*Allsbrook & Benton and Gay & Midyette for Rosemary and its Associates.*

DENNY, J. The only assignment of error is based on the exception to the signing of the judgment, dissolving the temporary restraining order, and denying the plaintiff's prayer that such order be made permanent. Therefore, the only question presented is whether error appears on the face of the record. *Parker v. Duke University,* 230 N.C. 656, 55 S.E. 2d 189, and cited cases. Such error appears where the facts found are insufficient to support the judgment, or where the conclusions of law are not supported by the facts. *Culbreth v. Britt Corp.,* 231 N.C. 76, 56 S.E. 2d 15; *Employment Security Com. v. Jarrell,* 231 N.C. 381, 57 S.E. 2d 403;

*Roach v. Pritchett,* 228 N.C. 747, 47 S.E. 2d 20; *Lea v. Bridgeman,* 228 N.C. 565, 46 S.E. 2d 555; *Smith v. Davis,* 228 N.C. 172, 45 S.E. 2d 51; *Redwine v. Clodfelter,* 226 N.C. 366, 38 S.E. 2d 203; *Rader v. Coach Co.,* 225 N.C. 537, 35 S.E. 2d 609.

The appellant contends the lease entered into between the District and Rosemary, 1 August, 1932, as amended in 1940, is void in so far as Rosemary and its associates are given priority over other customers of the District who purchase water for industrial purposes.

It is well to keep in mind that we are dealing with a contract between a private corporation and a *quasi*-municipal corporation, G.S. 130-39, which is not under the control or supervision of the North Carolina Utilities Commission as to services or rates. G.S. 62-30 (3). Therefore, the contention of the appellant is without merit unless the provisions in the lease of which it complains, constitute such unwarranted discrimination between customers of the District as to be against public policy. G.S. 130-39 (7).

A public utility, whether publicly or privately owned, "is under a legal obligation to serve the members of the public to whom its use extends, impartially and without unjust discrimination. . . . A public utility must serve alike all who are similarly circumstanced with reference to its system, and favor cannot be extended to one which is not offered to another, nor can a privilege given one be refused to another." 43 Am. Jur. 599; 51 C.J. 7. This is in accord with our decisions. *Public Service Co. v. Power Co.,* 179 N.C. 18, 101 S.E. 593; *Solomon v. Sewerage Co.,* 133 N.C. 144, 45 S.E. 536; *Griffin v. Water Co.,* 122 N.C. 206, 30 S.E. 319.

It is settled law with us that utility corporations under the jurisdiction and control of the North Carolina Public Utilities Commission must conform to the rates or charges established by the commission; and that a contract between such a utility corporation and a customer, fixing a lower rate for service than that established by the commission, is subject to the police power of the State, with respect to the rate to be charged under such contract. G.S. 62-123. *Corporation Commission v. Water Co.,* 190 N.C. 70, 128 S.E. 465; *Corporation Commission v. Mfg. Co.,* 185 N.C. 17, 116 S.E. 178; *Public Service Co. v. Power Co., supra.*

According to numerous authorities, however, a distinction is made between contracts for public utility services generally and a private contract where a rate or service has been fixed as a part of the consideration for the conveyance of property to the utility. 43 Am. Jur. 641; *Schiller Piano Co. v. Illinois Northern Utilities Co.,* 288 Ill. 580, 123 N.E. 631, 11 A.L.R. 454; *Cudahy Packing Co. v. City of Omaha,* 277 F. 49; *Sunset Shingle Co. v. Northwest Electric Water Works,* 118 Wash. 416, 203 Pac. 978; *Southern Pac. Co. v. Spring Valley Water Co.,*

173 Cal. 291, 159 Pac. 865; *Bond Bros. v. Louisville & Jefferson County Met. S. Dist.,* 307 Ky. 689, 211 S.E. 2d 867; *State v. Public Service Commission,* 83 Wash. 130, 145 P. 215; *Village of Long Beach v. Long Beach Power Co.,* 104 Misc. Rep. 337, 171 N.Y.S. 824. See also *Twin City Pipe Line Co. v. Harding Glass Co.,* 283 U.S. 353, 75 L. Ed. 1112.

It is stated in 51 C.J., p. 8, Sec. (19) F., "The fact that a business or enterprise is, generally speaking, a public utility, does not make every service performed or rendered by it a public service, but it may act in a private capacity as distinguished from its public capacity, and in so doing is subject to the same rules as a private person." *Phoenix v. Kasun,* 54 Ariz. 470, 97 P. 2d 210, 127 A.L.R. 84; *Western Union Telegraph Co. v. Louisville & N. R. Co.,* 250 F. 199. And in 51 C.J., p. 6, Sec. (13) B., it is also said: "Public utilities have the right to enter into contracts between themselves or with others, free from the control or supervision of the State, so long as such contracts are not unconscionable or oppressive and do not impair the obligation of the utility to discharge its public duties." *Oklahoma Gas & Elec. Co. v. Wilson & Co.,* 146 Okla. 272, 288 Pac. 316; *Oklahoma Gas & Elec. Co. v. Oklahoma Natural Gas Co.,* 85 Okla. 25, 205 Pac. 768.

In our opinion the agreement between the District and Rosemary is a private contract and does not fall within the purview of rate making power, even if the District were under the control and supervision of the State as to services or rates.

In the case of *Sunset Shingle Co. v. Northwest Electric Water Works, supra,* the Supreme Court of Washington held that where an electric light company before the construction of its plant contracted with a lumber mill whereby it received the site for its plant and the waste from the lumber mill as fuel in exchange for furnishing steam heat and electricity for power and lighting, the dedication of the electric plant to public service was subject to the contract obligations, even though some of the services to be rendered thereunder were public services.

In the *Schiller case, supra,* the plaintiff company conveyed an interest in a power dam in consideration of the agreement by the purchaser to furnish it, its successors and assigns, a continuous supply of "72.4 kilowatts of electrical energy free of charge unless prevented by act of God or inevitable accident." It was contended by the defendant, a successor to the original purchaser, that since it was subject to the provisions of the Public Utilities Act of the State of Illinois, the contract was void. However, the court held the contract was valid and enforceable against the purchaser, its successors and assigns; and, among other things, the Court said: "Legislation in the exercise of the police power must have relation to and be appropriate for the protection, preservation, and promotion of the public health, safety, morals, or welfare. An act which has

no tendency to affect or endanger the public in any of those particulars, and which is entirely innocent in character, is not within the police power. . . . Under the police power, the state has authority to enact legislation to regulate the charges and business of a public utility corporation; but if such legislation operates as a confiscation of private property, or constitutes an arbitrary or unreasonable infringement on personal or property rights, it will be held void, as in violation of the constitutional guaranty that no person shall be deprived of his property without due process of law."

In the instant case, the District was utterly powerless to carry out the purposes for which it was created, unless it could obtain a supply of filtered water without being required to expend the amount necessary to construct a water filtering plant. And the terms and conditions upon which the lease was executed and amended are valid and binding on the District, unless they are discriminatory and impair the obligation of the District to discharge its public duties.

The officials of the District were expressly authorized by G.S. 130-39 (7) and G.S. 130-39 (9) (b) to negotiate and enter into an agreement with the owners of existing water supplies, sewerage systems or other such utilities as might be necessary to carry into effect the purposes for which the District was created. And it is the accepted principle with us "that courts may not interfere in a given case with the exercise of discretionary powers conferred on these local administrative boards for the public welfare, unless their action is so clearly unreasonable as to amount to an oppressive and manifest abuse of discretion." *Lee v. Waynesville,* 184 N.C. 565, 115 S.E. 51; *Mullen v. Louisburg,* 225 N.C. 53, 33 S.E. 2d 484; *Asbury v. Albemarle,* 162 N.C. 247, 78 S.E. 146.

Under the terms of the first lease, the District obligated itself to furnish at cost to Rosemary and associates, water sufficient for all their requirements, and the District was entitled only to such surplus water as the District might filter in the leased plant, over and above the requirements of Rosemary and associates.

The amendment to the lease in 1940, entered into after Rosemary, at its own expense, had increased the capacity of the filter plant to one and one-half times its previous capacity, provided for the plant personnel to be placed under the joint control of the District and Rosemary, the annual rental to be only one dollar, and for the cost of the operation of the plant to be prorated between the District and Rosemary on a basis of consumption. The District under the terms of the lease as amended was given priority on the water filtered in the leased plant, in so far as the consumers of the District required it "for drinking, household and fire-fighting purposes," but Rosemary agreed only that industrial users in the District should be furnished water out of any surplus supply that re-

mained after furnishing the District with water for the above enumerated purposes and Rosemary and its associates with sufficient water to meet all their requirements.

In our opinion the lease contract existing between the District and Rosemary is clearly in the public interest. The taxpayers of the District have contributed nothing towards the construction of the leased filter plant or for any equipment used in connection therewith. And yet, under the terms of the agreement as amended, the District is able to obtain sufficient filtered water to meet all the purposes for which it was created at the cost of filtering plus a nominal rent of one dollar per year, without making any investment in a filter plant. The taxpayers and consumers of the District are further protected, in that, in the event the cost of filtering water should exceed the maximum amount fixed in the agreement which Rosemary and associates may be required to pay for their pro rata part of the water filtered in the plant, the District may cancel the lease. On the other hand, if the District shall fail to pay the rent or breach any of the conditions assumed and imposed upon it to be performed, Rosemary may terminate the lease. We find nothing in the arrangement between the District and Rosemary that constitutes an unlawful discrimination between customers of the District who are in similar circumstances.

Under the terms of the contracts between Rosemary and the District, the District has never been given the right to any water filtered in the leased plant for industrial purposes, except out of surplus water after the requirements of Rosemary and associates have been supplied. Of course in the disposal of any water the District may have for sale for industrial purposes, it must serve alike its industrial users who are "similarly circumstanced." 43 Am. Jur. 599. But the plaintiff and Rosemary and associates, in our opinion, are not "similarly circumstanced."

It is a matter of common knowledge that large amounts of water for industrial purposes are not usually available from municipally owned water plants. Ordinarily water for industrial purposes is provided by the particular industry requiring it or by special contract with the municipality where such municipality has an adequate supply.

We think the contracts under consideration are valid and enforceable, and that his Honor's conclusions of law are supported by his findings of fact.

The ruling of the court below will be upheld.

Affirmed.